**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| JANE DOE (S.E.S.) an individual, | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO.   8:24-cv-03776 |
| CHOICE HOTELS INTERNATIONAL, INC.; CHOICE HOTELS INTERNATIONAL SERVICES CORP.; AND PHILLIP HALL PROPERTIES, L.L.C. d/b/a QUALITY INN | |
| *Defendants.* | JURY TRIAL DEMANDED |

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

COMES NOW THE PLAINTIFF, Jane Doe (S.E.S.), and for her causes of action, files this Complaint against CHOICE HOTELS INTERNATIONAL, INC.; CHOICE HOTELS INTERNATIONAL SERVICES CORP.; AND PHILLIP HALL PROPERTIES, L.L.C. d/b/a QUALITY INN, as Defendants, and would respectfully show the Court and jury as follows:

## SUMMARY

1.      Jane Doe (S.E.S.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act through force, fraud, or coercion. [1] Traffickers use threats, violence,

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

1

manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

3.      Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[2] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[3]

4.      Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use more subtle forms of fraud and coercion.[4] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These techniques can include high levels of control, exposure to chronic stress and threat, isolation, provocation of fear, and the creation of a sense of helplessness in victims.[5]

5.      Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[6] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

6.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

---

[2] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[3] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/
[4] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[5] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).
[6] 18 U.S.C. §1591(e)(3).

7.    Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

8.    In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

9.    Jane Doe (S.E.S.) alleges that Defendants derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including Jane Doe (S.E.S.), with minimal risk of detection or interruption. Jane Doe (S.E.S.) further alleges that Defendants continued providing support for traffickers, including her own trafficker, despite obvious and apparent signs of sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

10.    Defendants continued supporting traffickers, including Jane Doe (S.E.S.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at their hotels and specifically at the Quality Inn located at 2526 W Airport Way, Boise, Idaho 83795 and the Sleep Inn located at 2799 W Airport Way, Boise, Idaho 83795. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

11.    Plaintiff, Jane Doe (S.E.S.) is a resident of Idaho. She may be contacted through her lead counsel, whose information is contained below.

12.     Jane Doe (S.E.S.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

13.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (S.E.S.)

14.     Choice Hotels International, Inc. is a for-profit Delaware corporation with its principal place of business in Rockville, Maryland. It may be served through its registered agent: Prentice-Hall Corporation System, Inc., 1305 12th Ave Rd, Nampa, Idaho 83686.

15.     Choice Hotels International Services Corp. is a Delaware Corporation with its principal place of business in Rockville, Maryland. It may be served through its registered agent: Prentice-Hall Corporation System, Inc., 1305 12th Ave Rd, Nampa, Idaho 83686.

16.     All references to Choice Hotels International, Inc. include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Choice Hotels International, Inc. now or at any time relevant to the claims herein.

17.     Defendants Choice Hotels International Inc and Choice Hotels International Service Corp, will collectively be referred to as "Defendant Choice Hotels", "Choice Hotels Defendants" or "Franchisor Defendants." Upon information and belief, they owned, operated, controlled, and/or managed the Quality Inn located at 150 I-65 Service Rd N, Mobile, AL 36608.

18.     Defendant Phillip Hall Properties, L.L.C. d/b/a Quality Inn is a for-profit Alabama limited liability company with its principal place of business in Alabama. It may be served through its registered agent: Phillip Hall, 1520 S Beltline Hwy, Mobile, AL 36693. At all relevant times,

Defendant Phillip Hall Properties, L.L.C. d/b/a Quality Inn owned, operated, controlled, and/or managed the Quality Inn at 150 I-65 Service Rd N, Mobile, AL 36608.

19.    Defendant Phillip Hall Properties, L.L.C. d/b/a Quality Inn "Franchisee" or "Franchisee Defendant."

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

22.    All Choice Hotels Defendants have the same principal place of business, which is in Rockville, Maryland within the District of Maryland Southern Division. Therefore, each of the Choice Hotels Defendants is a resident of the District of Maryland Southern Division for the purpose of § 1391(b)(1).

23.    Under 28 U.S.C. § 1391(c)(2), Franchisee Defendant is residents of Maryland for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over each Franchisee.

24.    Under § 1391(d), Franchisee Defendant is residents of Maryland for the purpose of § 1391(b)(1) because, if the District of Maryland Southern Division were a separate state, Franchisee's contacts with the district would be sufficient to subject it to personal jurisdiction.

25.    Plaintiff's claims against Franchisee Defendant arise out of Franchisee Defendant' contacts with Maryland through Franchisee Defendant' relationship with the Choice Hotels Defendants, which have their principal place of business in the District of Maryland Southern Division. Franchisee Defendant' participation in a venture with the Choice Hotels Defendants operating the subject motels occurred, in substantial part, in Maryland because:

a.  Upon information and belief, Franchisee Defendant actively sought out a franchising relationship by contacting the Choice Hotels Defendants in Maryland;

b.  Franchisee Defendant acknowledged that the negotiation, execution, and acceptance of the franchising agreement occurred in the District of Maryland Southern Division;

c.  Franchisee Defendant agreed that its ongoing performance of the franchising agreement would take place, in part, in the District of Maryland Southern Division;

d.  The franchising agreements had a choice of law provision selecting the law of Maryland as the governing law;

e.  The franchising agreements required Franchisee Defendant to report information to the Choice Hotels Defendants in Maryland, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like Jane Doe (S.E.S.);

f.  Franchisee Defendant agreed to submit all notices required under the franchising agreement to the Choice Hotels Defendants in the District of Maryland Southern Division;

g.  Franchisee Defendant were required to attend training and meetings in Maryland;

h.  The Choice Hotels Defendants dictated policies related to safety, security, human trafficking, employee training and Franchisee's response, as well as other subjects from their principal place of business in the District of Maryland Southern Division;

i.  Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the Choice Hotels Defendants from their principal place of business in the District of Maryland Southern Division;

j.  Franchisee Defendant were required to purchase insurance on behalf of one or more Maryland entities (the Choice Hotels Defendants);

k.  Upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by CHOICE HOTELS from its principal place of business in Maryland;

l.  Upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by Franchisor in Maryland;

m.  The benefit that Franchisee Defendant received from room rentals was governed by the Maryland franchising agreement;

n.  Franchisee Defendant agreed to make all payments due under the franchising agreement at the Choice Hotels principal place of business in the District of Maryland Southern Division;

o.  Franchisee Defendant' operation of the subject motels were controlled and/or influenced by many policies set and enforced by the Choice Hotels Defendants from their principal place of business in Rockville, Maryland; and

p.  Franchisee Defendant signed a software licensing agreement with the Choice Hotels Defendants for the property management software the Choice Hotels Defendants required Franchisee Defendant to use when operating the motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms. Franchisee Defendant agreed to file any lawsuit arising from the licensing agreement in the District of Maryland Southern Division and waived personal jurisdiction and venue objections.

## STATEMENT OF FACTS

**I.    Jane Doe (S.E.S.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendants.**

26.    Jane Doe (S.E.S.) is a survivor of sex trafficking. Her trafficking began around July of 2013 and continued through December 2014. Jane Doe (S.E.S.) was a minor during her trafficking.

27.    Jane Doe (S.E.S.) met her trafficker in 2013 when she was only 16 years old. Jane Doe (S.E.S.) was introduced to a man and began a relationship with him having no reason or knowledge to suspect that she would be forced into sex trafficking. However, from July of 2013 and through December 2014 Jane Doe (S.E.S.) was forced to engage in commercial sex acts numerous times a day by her trafficker who would drug her up and physically and/or mentally abuse her. Jane Doe was in constant fear for her life.

28.    She did not want to engage in commercial sex acts but when she tried to leave, her trafficker would beat her and/or threaten her. Her trafficker engaged in a pattern of control and intimidating and threatening behavior that caused Jane Doe (S.E.S.) to believe she would face

serious harm or physical restraint if she did not comply with their ongoing demand that she engage in commercial sex for their financial benefit.

29.     Jane Doe (S.E.S.) was not allowed to keep any of the money she made.

30.     At various times between July of 2013 and December 2014, Jane Doe (S.E.S.) was trafficked at the Quality Inn located at 2526 W Airport Way, Boise, Idaho 83795.

31.     At various times between July of 2013 and December 2014, Jane Doe (S.E.S.) was trafficked at the Quality Inn at 150 I-65 Service Rd N, Mobile, AL 36608 "Subject Quality Inn."

32.     Jane Doe (S.E.S.)'s sexual exploitation repeatedly occurred in rooms of the Subject Quality Inn and was facilitated by the Choice Hotels Defendants and Franchisee Defendant.

33.     Between July of 2013 and December 2014, Jane Doe (S.E.S.) was trafficked an incalculable number of times at the Subject Quality Inn.

## II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

34.     While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Franchisor Defendants and Franchisee Defendant knew or should have known regarding the trafficking at their hotel properties, trafficking activity, including the trafficking of Jane Doe (S.E.S.), was pervasive and apparent at the Subject Quality Inn.

35.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[7] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[8] In 2014, 92 percent of calls to the Human

---

[7] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*
[8] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

Trafficking Hotline involved reports of sex trafficking taking place at hotels.[9] Hotels have been found to account for over 90 percent of commercial exploitation of children.[10]

36.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[11]

37.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[12]

38.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

    a.    Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

---

[9] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[10] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[11] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf.

[12] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking,    https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.Texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

b.  Individuals show signs of physical abuse, restraint, and/or confinement;

c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.  Individuals lack freedom of movement or are constantly monitored;

f.  Individuals avoid eye contact and interaction with others;

g.  Individuals have no control over or possession of money or ID;

h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i.  Individuals have few or no personal items—such as no luggage or other bags;

j.  Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k.  A group of girls appears to be traveling with an older female or male;

l.  A group of males or females with identical tattoos in similar locations.  This may indicate "branding" by a trafficker;

m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.  Possession or use of multiple cell phones; and

p.  Possession or use of large amounts of cash or pre-paid cards.[13]

39.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex

---

[13] *Id.*

trafficking.[14] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

40.    The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[15] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

41.    The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[16]

42.    All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

43.    All Defendants were specifically aware that commercial sex in a hotel environment, involving a "pimp," implicitly involves to sex trafficking. Defendants received training and guidance on this. Defendants knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of

---

[14] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[15] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*,
https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[16] *Id.*

commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of sex trafficking. Reasonable diligence required Defendants to avoid benefiting from the rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

44.    The most effective weapon against sexual exploitation and human trafficking is education and training.[17] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[18]

45.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[19]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

46.    There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing

---

[17] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[18] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[19] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

47.    Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, Franchisee Defendant, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking.

48.    Each of the Franchisor Defendants and Franchisee Defendant had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

49.    Unfortunately for Jane Doe (S.E.S.), the promises made by the Franchisor Defendants and Franchisee Defendant have proven empty. Franchisor Defendants and Franchisee Defendant have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (S.E.S.)

**III.    Sex Trafficking Has Long Been Prevalent at Choice Hotels' Branded Properties, and Choice Hotels Has Known It.**

50.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants have known, since well before Jane

Doe (S.E.S.)'s trafficking, that sex trafficking was ongoing and widespread at Choice Hotels branded properties including the subject properties named herein.

        a.  **Sex Trafficking at Choice Hotel Branded Hotels was well Known by Defendants**

51.    Upon information and belief, each of the Defendants monitored criminal activity occurring at Choice hotels branded properties and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the Subject Quality Inn where Jane Doe (S.E.S.) was trafficked.

52.    Scores of news stories from across the US highlight Choice Hotel's facilitation of sex trafficking and certainly establish that Defendants knew, or should have known, of the use of Choice Hotels branded properties for sex trafficking.

53.    Information that has become public through news stories establishes the entrenched and pervasive nature of Defendant Choice Hotels' role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of Choice hotels properties for illegal activity, the following was noted:

> o  In 2004, A Los Angeles County woman faces charges of running a brothel in a budget motel across the street from Disneyland after three immigrants told police they were smuggled into the country and forced into prostitution. Guest at the Econo Lodge, where the makeshift brothel was operated, can see the Disneyland Hotel and a giant set of Mickey Mouse ears silhouetted on a roller coaster at California Adventure, Disneyland's sister attraction.[20]

> o  In 2012, A nationwide sex trafficking ring run by a violent pimp and his associates used Backpage.com to solicit customers for prostitutes as young as age 17, advertising the women as "smokin' hot babes," according to a federal indictment recently unsealed in Iowa. The two are charged in Iowa because Des Moines was a site where the ring did business on at least four occasions, sometimes holing up in an Econo Lodge near Interstate 35, the indictment says.[21]

---

[20] Claire Luna and Mai Tran, *Arrest in Sex Slave Case*, Los Angeles Times (February 13, 2004), https://www.latimes.com/archives/la-xpm-2004-feb-13-me-sexslave13-story.html
[21] Ryan J. Foley, *Feds: Sex trafficking ring used Backpage.com ads*, Associated Press (May 24, 2012), https://apnews.com/article/archive-de22067580494953bc14f6e9cfcca4aa

o   In 2013, A man arrested for human trafficking in Dothan appears to be part of a human trafficking circuit. Police say Alonso Santiagito held a Mississippi teen against her will, beat her, forced her to do drugs, and sold her for sex. He was holding the girl and other victims at the Quality Inn on Ross Clark Cir.[22]

o   An Orlando man faces several felony charges after authorities say he kept an underage girl as a prostitute against her will and beat her. The investigation into Tyquarius Jevonte Lebby, 24, began Dec. 8 after the Metropolitan Bureau of Investigation received a tip that an underage girl was being held against her will at an Orange Blossom Trail motel, according to court documents. Authorities found explicit pictures of the girl on the internet. Agents posed undercover as clients and went to a room at the Rodeway Inn on the 6100 block of South Orange Blossom Trail.[23]

o   In 2013, Two Columbia residents arrested in connection with a nationwide child sex trafficking bust were denied bond Monday in federal court. The 16-year-old, whose picture appeared in an online ad on backpage.com, was allegedly used for prostitution on three days in hotels in Columbia and Hilton Head. The FBI has hotel receipts where Gibson paid cash for the room at Quality Inn at the time of the undercover operation, as well as a copy of his driver's license where he reserved the room.[24]

o   In 2013, A runaway Mississippi teen has found herself caught in the middle of a South Alabama sex slavery ring. The girl, whom police say is over 15, was held against her will at the Quality Inn in Dothan.[25]

o   In 2013, Milwaukee police are searching for a 34-year-old man believed to have kidnapped a homeless woman and forced her into prostitution. Reno took photos of her and posted them on an online site known to advertise prostitutes and forced her into prostitution at the Rodeway Inn in Milwaukee.[26]

o   In 2013, Jerel Jackson, 28, allegedly operated a prostitution venture between May 2012 and July 2013 primarily out of motels in Philadelphia. In April 2013, Jackson drove her and three others to Dover, Del., where they worked out of a room at the

---

[22] *Dothan man arrested for human trafficking a teenager*, WTVM news 9 (August 13, 2013), https://www.wtvm.com/story/23122332/dothan-man/
[23] Michael Williams, *Authorities: Man trafficked, beat underage girl*, Orlando Sentinel, https://digitaledition.orlandosentinel.com/tribune/article_popover.aspx?guid=15cb9583-a04b-4eba-a5e7-  5e38eefb25f7
[24] *Two accused of sex trafficking children denied bond*, WIS News 10 (August 5,    2013), https://www.wistv.com/story/23048777/two-accused-of-sex-trafficking-children-denied-bond/
[25] *Shock after man charged with human trafficking of girl in Dothan*, WSFA News 12 (August 13, 2013), https://www.wsfa.com/story/23118431/shock-after-man-charged-with-human-trafficking-of-girl-in-dothan/
[26] Ashley Luthern, *Milwaukee police search for man in kidnapping*, prostituting of woman, Milwaukee Journal Sentinel (August 2, 2013), https://archive.jsonline.com/news/crime/milwaukee-police-search-for-man-in-kidnapping-prostituting-of-woman-b9967520z1-218117721.html/

Sleep Inn and Suites on N. Dupont Highway until their operation was shut down by local police, according to the affidavit.[27]

o  In 2014, Charlotte-Mecklenburg Police have arrested three people on human trafficking charges. Officers were called out to the Quality Inn on Griffith Street a couple of days ago to investigate a complaint.[28]

o  In 2014, A Houston County jury found a Tennessee man guilty on Thursday afternoon of human trafficking and giving drugs to a 17-year-old girl. Police were made aware of the case when the victim left the Quality Inn, where she said she was being held, and walked almost 8 miles to the Guest House Inn, where she was taken in by a patron there.[29]

o  In 2014, Two people arrested and charged with the human trafficking of 16 and 17-year-old girls at North Monroe Street hotels last week caught the eyes of the community and human trafficking experts, who say the case may be part of a larger enterprise in Tallahassee. In addition to the teens, two other violent confrontations at the Econo Lodge on North Monroe Street involved women working as prostitutes with Backpage ads.[30]

o  In 2015, Three people are in custody following the discovery of drug and prostitution operations in Pooler, Georgia. Undercover Chatham-Savannah Counter Narcotics Team (CNT) agents conducted a search of two hotel rooms at the Econo Lodge hotel located at 500 East Highway 80 in Pooler, Georgia. The search resulted in the seizure of controlled substances, items commonly associated with drug use and distribution, items commonly associated with prostitution and various weapons.[31]

54.  These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Choice Hotels branded hotels. Moreover, on information and belief, the Choice Hotels Defendants are aware of additional

---

[27] Sam Wood, *Philly man faces charges of sex-trafficking by force*, The Inquirer (November 14, 2013), https://www.inquirer.com/philly/hp/news_update/Philly_man_faces_charges_of_sex-trafficking_by_force.html?outputType=amp

[28] *3 arrested on human trafficking charges in Charlotte*, WCNC News (May 30, 2014), https://www.wcnc.com/article/news/crime/3-arrested-on-human-trafficking-charges-in-charlotte/275-292839989

[29] *18 Man Guilty in Human Trafficking Case*, End Slavery Tennessee, (May 15, 2014), https://www.endslaverytn.org/news/man-guilty-in-human-trafficking-case-newsarticle

[30] Sean Rossman, *Arrests for sex trafficking 'tip of the iceberg' in Tallahassee*, Tallahassee Democrat (June 2, 2014), https://www.tallahassee.com/story/news/local/2014/06/02/sex-trafficking-arrests-tallahassee/9856065/

[31] *Multiple arrests in Pooler for drugs and prostitution*, WJCL News 22 (September 25, 2015), https://www.wjcl.com/article/multiple-arrests-in-pooler-for-drugs-and-prostitution/935100#

significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

55.    Upon information and belief, each of the Choice Hotels Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific property where Jane Doe (S.E.S.) was trafficked.

56.    Reviews of Choice Hotels Branded properties, which upon information and belief each of the Choice Hotels Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at its branded properties and the Choice Hotels Defendants' knowledge of the same. For example:

- A TripAdvisor review from January 26, 2006, stated, "Hookers in the parking lot approaching members of our group.  When I complained, especially about the hookers, I was told there wasn't much they could do and they would 'pass on the complaints to the management"[32]

- A TripAdvisor review from September 18, 2012, stated, "Worst hotel ever…The smell of weed was horrible.  Smell came right in our room from all the other rooms. Hookers up and down the hallways…never again!"[33]

- A TripAdvisor review from January 21, 2012, stated, "During my stay here every time I would go outside I was approached by someone wanting to bum a cigarette or wanting to sell me or buy drugs.  The staff here are extremely rude to say the least.  When I questioned why all the drug dealers and prostitutes, I was told by a member of the hotel staff because business is slow…If you are a normal everyday person, and not a drug addict or a John looking to get laid you don't want to come here!!!"[34]

---

[32]https://www.tripadvisor.com/Hotel_Review-g34515-d17803954-Reviews-Quality_Inn_Suites_Downtown-Orlando_Florida.html
[33] https://www.tripadvisor.ca/Hotel_Review-g34515-d85472-Reviews-Quality_Inn_Orlando_Near_Universal_Blvd-Orlando_Florida.html
[34] https://www.tripadvisor.ca/Hotel_Review-g34141-d84259-Reviews-Rodeway_Inn_Clearwater_Largo-Clearwater_Florida.html

- A Yelp review from October 2, 2012, stated, "Great hotel, if you enjoy being propositioned by prostitutes. Skid row's finest. A real DUMP."[35]

- A TripAdvisor review from October 22, 2013, stated, "Don't go unless you are looking for 1 hour hotel! Cock roaches and used condoms were found in our room. Hotel staff is obviously used to these complaints. They simply asked, 'how many of them did you exactly find?' there were few drug addicts in the hotel!!!"[36]

- A TripAdvisor review from August 20, 2013, stated, "Two types of Hookers were offered by a pimp standing at the stairway (regular and tranny, whatever that means). Also, there is a lot of weed being smoked in the area, so no need to buy any from the dealer who stood in the parking lot all night, just inhale in your room and you'll be high enough. We did not feel safe since the pimp that hung around carried a gun visibly and told us, 'not to worry about anything, he had the area covered."[37]

- A TripAdvisor review from October 25, 2012, stated, "This hotel is awful. Between hookers running around, car alarms going off, people fighting and fussing, and the train that runs through here every night. I PROMISE YOU WON'T GET ANY SLEEP. It's pretty old and nasty. I have no idea how their in business. I'm assuming it's just for local hookers and drugs. Stay far away from here!!!"[38]

- A TripAdvisor review from January 5, 2013, stated, "Upon arriving back [at the hotel] our second night we were greeted by a woman of "dubious morals" (hooker" sitting outside waiting for her "date" to arrive, we assumed."[39]

- A TripAdvisor review from April 24, 2013, stated, "This was the most disgusting hotel I have ever had the misfortune of checking into. I had come to Orlando to meet with my sister who was flying in from the UK…Checked in, and 30 minutes later checked out. This hotel had cockroaches, the room we were given was filthy, a visiting prostitute went to the room next door whilst we stood and watched."[40]

- An Expedia review form November 9, 2013, stated, "I would not recommend this hotel to my worst enemy. The room next to me was being used to turn "tricks." Drunk or drugged out guests were yelling during the night. They were also running up and down the corridor beating on the doors at 4:00 in the morning. Did not feel

---

[35] https://www.yelp.com/biz/days-inn-by-wyndham-sarasota-bay-sarasota
[36] https://www.tripadvisor.ca/Hotel_Review-g34515-d85472-Reviews-Quality_Inn_Orlando_Near_Universal_Blvd-Orlando_Florida.html
[37] https://www.tripadvisor.ca/Hotel_Review-g34515-d85472-Reviews-Quality_Inn_Orlando_Near_Universal_Blvd-Orlando_Florida.html
[38] https://www.tripadvisor.com/Hotel_Review-g54229-d275440-Reviews-Suburban_Extended_Stay_Hotel-Florence_South_Carolina.html
[39] https://www.tripadvisor.co/Hotel_Review-g34657-d231960-Reviews-Suburban_Extended_Stay_Hotel_Stuart-Stuart_Florida.html
[40] https://www.tripadvisor.ca/Hotel_Review-g34515-d85472-Reviews-Quality_Inn_Orlando_Near_Universal_Blvd-Orlando_Florida.html

one bit safe at this hotel.  Actually checked out early and stayed somewhere else.  Never stay here."[41]

- An Expedia review from February 11, 2014, stated, "The price is nice for what we got the room for ($42/night) but honestly it wasn't worth it. I would of rather paid little more for a nicer place.  First night we heard some prostitute arguing with some cheapskate guy and kicked him out her room and was crying.  We were hardly at the room tho, which helped.  It's a pretty sketchy hotel in my opinion."[42]

- An Expedia review from July 17, 2016, stated, "The only nice part was the pool, which was not clean…The hotel seemed to be a front of a drug cartel. The staff smiled at you but did not care about the quality of your stay. Someone tried to break into our room at 1 am.  Scared the out of me and my family. Will never stay again…instead I will choose to sleep on the side of the road.  DO NOT STAY HERE!"[43]

- A Google review from 2016, stated, "The place sucks.  We had spiders under the sheets when pulled them off the bed.  Would not recommend the place to anyone.  Plus all the prostitution outside makes it even worse."[44]

- A Google review from 2016, stated, "AWFUL!!! Was extremely filthy. Smelled of mold and body odor.  Early evening before dark when we checked in it seemed pretty quiet.  As it got dark and later into night, the whole place seemed to fill up with prostitutes.  Very loud."[45]

---

[41] https://www.expedia.com/Florence-Hotels-Suburban-Extended-Stay-Hotel.h911306.Hotel-Reviews

[42] https://www.expedia.com/Tampa-And-Vicinity-Hotels-Suburban-Studios-Airport.h885992.Hotel-Reviews

[43] https://www.expedia.com/Augusta-Hotels-Suburban-Extended-Stay-Hotel.h168338.Hotel-Reviews

[44]
https://www.google.com/travel/hotels/Suburban%206902%20W%20Hillsborough%20Ave,%20Tampa,%20FL%2033634%20google/entity/CgsIx-qG0bLw1cqSARAB/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,442919 2,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,48 86480,4892707,4893075,4902277,4905351,4905599,4926165,4926489,4931360,4935494,4936396,4937897,47061 553&hl=en-US&gl=us&ssta=1&q=Suburban+6902+W+Hillsborough+Ave,+Tampa,+FL+33634+google&grf=EmQKLAgOEig SJnIkKiIKBwjnDxAEGBISBwjnDxAEGBMgADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg4 YzJjMjA2N2Q0M2FlZTE6MHg5Mjk1NTc4MzJhMjFiNTQ3Q3&rp=EMfqhtGy8NXKkgEQx-qG0bLw1cqSATgCQABIAcABAg&ictx=1

[45]
https://www.google.com/travel/hotels/Suburban%20Extended%20Stay%201900%20SE%20Federal%20Hwy,%20St uart,%20FL%2034994/entity/CgsIv4-a4ce0vJefARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192, 4515404,4597339,4718358,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,487 9519,4886082,4886480,4893075,4902277,4905351,4905600,4906023,4906050,4920622,4926165,4926489,493075 1,4930753,4931265,4934307,4936396,4937954,47061553&hl=en-US&gl=us&ssta=1&q=Suburban+Extended+Stay+1900+SE+Federal+Hwy,+Stuart,+FL+34994&grf=EmQKLAgO EigSJnIkKiIKBwjnDxACGBMSBwjnDxACGBQgADAeQMoCSgcI5w8QARgZCjQIDBIwEi6yASsSKQonCiUwe

- A TripAdvisor review from September 15, 2016, stated, "I've stayed in some BAD places before, but this hotel wins the prize for most nasty…Every night was a drunken Las Vegas type party outside our room, and the prostitutes basically ran the show…There is basically no maid service. You have to ask them to clean your room…there are people fighting drunk outside every night, prostitutes running around in their underwear, you could smell marijuana coming out of every room, and drug dealers were running around asking folks what they wanted."[46]

- A Yelp review from April 2, 2016, stated, "By far this has been the worst hotel experience I've ever encountered. Between the extremely loud drunks all night, the mass amounts of prostitution (I was asked by 3 if I wanted their services), the drug dealers everywhere (I was asked by 2 if I wanted to buy drugs). All of these people were staying at your hotel. I was originally going to stay for 16 days but do to all the above I was forced to change hotels. This was supposed to be my vacation while visiting my kids before I go back out on deployment. And the way they corrected this wrong doing is by emailing me a 'I'm sorry letter.' This place need to be closed down.[47]

- A Google review from 2017, stated, "Hotel filled with hookers, drug dealers, drunks and awful rooms."[48]

- A Google review from 2018, stated, "The worst, I left room after I found the 5th cock roach. Hotel full of semi-permanent residents, prostitutes, and drug addicts…Can't believe this is a name brand hotel, do not stay here if you're driving by hit the gas and keep on going."[49]

Dg4ZGVkZDBjNGM5ZGJhYTc6MHg5ZjJlZjFhNDdjMjY4N2Jm&rp=EL-PmuHHtLyXnwEQv4-a4ce0vJefATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwjLl_OO--P8AhXQkWoFHejJC8MQ4gl6BAh5EAU

[46] https://www.tripadvisor.com/Hotel_Review-g54229-d275440-Reviews-Suburban_Extended_Stay_Hotel-Florence_South_Carolina.html

[47] https://www.yelp.com/biz/suburban-extended-stay-hotel-florence

[48]

https://www.google.com/travel/hotels/Suburban%20Extended%20Stay%201914%20W%20Lucas%20St,%20Florence,%20SC%2029501%20google/entity/CgoIs5OZ1oTbiY1aEAE/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4906023,4926165,4926489,4930751,4930752,4931360,4934343,4936396,4937897,47061553&hl=en-US&gl=us&ssta=1&q=Suburban+Extended+Stay+1914+W+Lucas+St,+Florence,+SC+29501+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGAESBwjnDxACGAIgADAeQMoCSgcI5w8QARgeCjQIDBIwEi6yASsSKQonCiUweDg4NTU2NjQ0OYzU1MGE1OWY6MHg1YTFhMjZkODRhYzY0OWIz&rp=ELOTmdaE24mNWhCzk5nWhNuJjVo4AkAASAHAAQI&ictx=1&sa=X&ved=2ahUKEwil7YSNwfD8AhXFyLsIHZ08ClMQ4gl6BAhmEAU

[49]

https://www.google.com/travel/hotels/Suburban%20Extended%20Stay%201900%20SE%20Federal%20Hwy,%20Stuart,%20FL%2034994/entity/CgsIv4a4ce0vJefARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4718358,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4879519,4886082,4886480,4893075,4902277,4905600,4906023,4906050,4920622,4926165,4926489,49305

- A Google review from 2018, stated, "Well what can I say about here…if your looking for drugs and prostitution delivered to your door, then look no further…So if you are looking for an overpriced pay by the night trap house, the Suburban is for you.  Good luck!"[50]

57.    These and other news stories, guest surveys, and online reviews show that the use of Choice Hotel branded hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of Choice Hotel branded hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

58.    Each Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Choice Hotel branded hotels, including the Subject Quality Inn, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Subject Quality Inn frequently and long after the trafficking of Jane Doe (S.E.S.)

59.    This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (S.E.S.) was trafficked at the subject properties, the Choice Hotels Defendants knew or should have known that:

---

1,4930753,4931265,4934307,4936396,4937954,47061553&hl=enUS&gl=us&ssta=1&q=Suburban+Extended+Stay+9
00+SE+Federal+Hwy,+Stuart,+FL+34994&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGBMSBwjnDxACGBQgAD
AeQMoCSgcI5w8QARgZCjQIDBIwEi6yASsSKQonCiUweDg4ZGVkZDBjNGM5ZGJhYTc6MHg5ZjJlZjFhNDdj
MjY4N2Jm&rp=EL-PmuHHtLyXnwEQv4- a4ce0vJefATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwjLl_OO-
-P8AhXQkWoFHejJC8MQ4gl6BAh5EAU

50

https://www.google.com/travel/hotels/Suburban%20Extended%20Stay%201900%20SE%20Federal%20Hwy,%20St
uart,%20FL%2034994/entity/CgsIv4-
a4ce0vJefARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,
4515404,4597339,4718358,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,487
9519,4886082,4886480,4893075,4902277,4905351,4905600,4906023,4906050,4920622,4926165,4926489,493075
1,4930753,4931265,4934307,4936396,4937954,47061553&hl=en-
US&gl=us&ssta=1&q=Suburban+Extended+Stay+1900+SE+Federal+Hwy,+Stuart,+FL+34994&grf=EmQKLAgO
EigSJnIkKiIKBwjnDxACGBMSBwjnDxACGBQgADAeQMoCSgcI5w8QARgZCjQIDBIwEi6yASsSKQonCiUwe
Dg4ZGVkZDBjNGM5ZGJhYTc6MHg5ZjJlZjFhNDdjMjY4N2Jm&rp=EL-PmuHHtLyXnwEQv4-
a4ce0vJefATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwjLl_OO--P8AhXQkWoFHejJC8MQ4gl6BAh5EAU

    a. There was widespread and ongoing sex trafficking occurring at Choice Hotel branded properties;

    b. Sex trafficking was a brand-wide problem for Choice Hotels originating from management level decisions at their corporate offices in Rockville, Maryland;

    c. Choice Hotels Franchisee Defendant and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

    d. Choice Hotels Defendants' efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

    e. Choice Hotels and its Franchisee Defendant were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

60. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, the Choice Hotels Defendants chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

    **b.** **Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Quality Inn.**

61. Choice Hotels Defendants and Franchisee Defendant were specifically aware that sex trafficking was widespread and ongoing at the Subject Quality Inn.

62. Traffickers, including Jane Doe (S.E.S.)'s trafficker, repeatedly chose to use the Subject Quality Inn for their sex trafficking activity. As such, Choice Hotels Defendants and Franchisee Defendant also knew or should have known about the pervasive sex trafficking at the Subject Quality Inn based on obvious indicators of this activity.

63. Internet reviews for the Subject Quality Inn, which upon information and belief the Choice Hotels Defendants manage and monitor, confirm the presence of criminal activity associated with sex trafficking at the Subject Quality Inn. For example:

    • A 2015 TripAdvisor review states: "This hotel is dirty, rundown, and overpriced. Hallway floors were sticky and hadn't been mopped in gosh knows how long. Shower barely sprayed, tv remote was held together with duct tape,

and we found a condom wrapper on the floor upon entering our room! Lucky my husband found it instead of one of my daughters. The room and hallway smelled musty. We couldn't get out of there fast enough."[51]

- A 2018 Google review states: "Started unloading luggage and we see hookers in the parking lot and i go inside and find a gosh darn mother trucking cockroach infestation and a dead mouse under the minifridge bed bugs in the bed browned sheets we immediatly left it was very nice and cold and was overall good until the hookers and roaches. STAY AWAY AT ALL COSTS."[52]

- A 2018 Google review states: "Within 30 minutes of staying we found condoms, WEED, cigarette butts, a gigantic bra, makeup stains and garbage in our room.  The bathroom smelled like cigarettes.  And to top in off when I plugged in the alarm clock I got a pretty solid electric shock. None of the outer door security works.  There are highway underpasses that are more inviting than this place. I've seen cleaner bar bathrooms.  I'd rather sleep in a coffin with a decaying strangers body.The staff was nice."[53]

- A 2018 Google review states: "… I checked in on Friday night. I was on the 3rd floor. The moment I walked off the elevator of the 3rd floor the hallway reeked of WEED due to someone smoking it in their room! (That was problem number 1) I had my 2 kids with me under the age of 2; my 7month old woke up at 430 in the morning going into Saturday and when I got up to change and make him a bottle (I was in a suite room) I walked near my room door and the smell of weed was coming into my room it was so strong! (ABSOLUTELY RIDICULOUS) my family and I left Saturday morning to go to Gulf Shores and did not get back to the hotel until about 11:30pm; there were ABSOLUTELY no parking spots for guests due to people parking and standing around there cars (it appeared that they were selling drugs/meeting up to bring people into the hotel) so I was upset about that. I went upstairs and as soon as I came off the elevator it again reeked of WEED and it was STRONG even STRONGER than Friday night. It was loud and the music was so loud the floor was shaking. I got into my room and my family and I did not go to sleep until after 2am due to the racket. I file complaints; the hotel did nothing. There were people running up and down the hallways screaming, music up loud, and there were parties going on in 2 rooms. One across from my room and one directly beside my room the noise was still going at 3-4am extremely loudly along with the weed smell! Which let me point out that the HOTEL has a sign on the door entering the hotel that the hotel is a NON SMOKING facility…"[54]

- A 2018 Google review states: "Quality shouldn't be the name of this place.We evacuated here because of Hurricane Irma.Not much choice traveling with three

[51] https://www.expedia.com/Mobile-Hotels-Quality-Inn-Suites-At-Airport-Blvd-I-65.h50264.Hotel-Information
[52] https://www.google.com/maps/place/?q=place_id:ChIJlbgJ351NmogRWTA76PZU5zo&source=mc
[53] https://www.google.com/maps/place/?q=place_id:ChIJlbgJ351NmogRWTA76PZU5zo&source=mc
[54] https://www.google.com/maps/place/?q=place_id:ChIJlbgJ351NmogRWTA76PZU5zo&source=mc

dogs and the biggest hurricane ever forcing us to flee our home.Our room had old cigarette butts on the floor when we checked in and talking to some people in the parking lot they said their rooms still had old used condoms in the bed and joints in the room.Avoid this place at all expenses.The hotels next door are havens for hookers and druggies."[55]

• A 2018 Expedia review states: "If I could give no stars,  I would. Staff was unhelpful. The room was stuffy. The air made terrible noises. They didn't clean our room,  but said they did. No new towels,  no new coffee,  nothing. Asked twice. Nothing. Used Condoms outside. Just terrible."[56]

• A 2018 Expedia review states: "This place is terrible and in a scary neighborhood...There was obvious illegal activity... prostitutes and drug dealers...the staff did not enforce the rules We picked this hotel because of the pool but the pool was filled with loud rambunctious people that were cursing and smoking marijuana...I notified the staff but nothing happened."[57]

• A 2018 TripAdvisor review states: "…The rooms were nasty and appeared old and run down. One room had a very strong smell of pot. The vending machines did not work and the front desk charged double the cost for a drink or snack than the price listed on the machines. We had to ask multiple times for pillows and blankets for the rooms. The staff was rude. the "buffet style" breakfast was cold and disgusting. The milk they offered was spoiled and sour. When these issues were addressed with the staff the only response was "well no one told me that from the last shift". The shuttle driver expected a tip when all he did was drive the van. He did not assist with luggage in any way. The location appears to be a bad part of town that supports prostitution and drug use."[58]

• A 2019 Google review states: "Strong smell of weed in the hallways. Also the presence of hookers did not impress me.   Not coming back."[59]

• A 2019 Expedia review states: "The property is very,very,very dirty . Itâ€™s smell very bad . The bed comforters had blood stains. There were no towels. There was only one worker on the whole property. Who could not leave the service desk to get towels cleaned. She did her best to help us. I would not recommend anybody to stay here.There were Prostitutes and drug dealers walking around the property. It is not a safe place to be."[60]

• A 2020 Google review states: "…Literally the worst hotel stay I've ever had. There were hookers working the parking lot, pool paint was peeling all the way

---

[55] https://www.google.com/maps/place/?q=place_id:ChIJlbgJ351NmogRWTA76PZU5zo&source=mc
[56] https://www.expedia.com/Mobile-Hotels-Quality-Inn-Suites-At-Airport-Blvd-I-65.h50264.Hotel-Information
[57] https://www.expedia.com/Mobile-Hotels-Quality-Inn-Suites-At-Airport-Blvd-I-65.h50264.Hotel-Information
[58] https://www.tripadvisor.com/Hotel_Review-g30709-d636383-Reviews-Quality_Inn_Suites-Mobile_Alabama.html
[59] https://www.google.com/maps/place/?q=place_id:ChIJlbgJ351NmogRWTA76PZU5zo&source=mc
[60] https://www.expedia.com/Mobile-Hotels-Quality-Inn-Suites-At-Airport-Blvd-I-65.h50264.Hotel-Information

around and the tables in that area wiggled so much that when we sat a drink down the drink automatically fell over…[61]

64.     Defendants knew that a population of traffickers, including Jane Doe (S.E.S.)'s trafficker, repeatedly chose to use the Subject Quality Inn for their sex trafficking activity. They selected these hotels because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Subject Quality Inn. There were obvious signs of this activity, which were consistent with the well-known "red flags" for sex trafficking in the hospitality industry. As such, Defendants also knew or should have known about the pervasive sex trafficking at the Subject Quality Inn based on obvious indicators of this activity.

65.     This population of traffickers, including (S.E.S.)'s trafficker, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

66.     Upon information and belief, there were other victims being trafficked at the Subject Quality Inn at the same time as (S.E.S.) and there were obvious signs these victims were being trafficked.

67.     Based upon information and belief, the conduct of Defendants facilitated the trafficking of a number of victims by a population of multiple traffickers at the Subject Quality Inn. Defendants developed a continuous business relationship with this population of traffickers who operated at the hotel on a routine and repetitive basis.

68.     Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Subject Quality Inn

---

[61] https://www.google.com/maps/place/?q=place_id:ChIJlbgJ351NmogRWTA76PZU5zo&source=mc

named herein prior to Jane Doe (S.E.S.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

69.     All knowledge from the staff at these Subject Quality Inn is imputed to Franchisee Defendant. Franchisee Defendant knew about this widespread and ongoing trafficking at these Subject Quality Inn, including the trafficking of Jane Doe (S.E.S.), through the direct observations of hotel staff, including management-level staff.

70.     Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from hotel staff and management, the Choice Hotels Defendants learned or should have learned about the obvious signs of widespread trafficking at the Subject Quality Inn referenced herein, based on non-public sources of information including but not limited to:

a.   Surveillance of property;

b.   Internal investigations;

c.   Customers complaints;

d.   Monitoring of customer feedback;

e.   Information received from law enforcement.

71.     Upon information and belief, both the Choice Hotels Defendants and Franchisee Defendant knew or should have known about the widespread trafficking at the Subject Quality Inn referenced herein, based on:

   a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Choice Hotels Defendants;

   b. The Defendants' regular monitoring of online reviews;

   c. The Defendants' collection and monitoring of customer surveys and complaints;

   d. The Defendants' regular inspections of the hotel property;

   e. Information provided to Defendants by law enforcement; and

   f. Other sources of information available to Defendants.

72.     Upon information and belief, under the Choice Hotels Defendants' protocols, which on their face required hotel staff and management to report suspected criminal activity to the Choice Hotels Defendants, hotel staff and management were required to report numerous instances of suspected sex trafficking to the Choice Hotels Defendants prior to Jane Doe (S.E.S.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Subject Quality Inn.

73.     Upon information and belief, the Choice Hotels Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the Subject Quality Inn based on their supervision and monitoring of the property.

   **c. Defendants knew the venture that resulted in Jane Doe (S.E.S.)'s trafficking was operating at the Subject Quality Inn because of the apparent and obvious "red flags" of sex trafficking.**

74.     During the period that Jane Doe (S.E.S.) was trafficked at the Subject Quality Inn named herein, there were obvious signs that her trafficker were engaged in sex trafficking:

   a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

b. Other girls were trafficked at the same hotel at the same time as Jane Doe (S.E.S.);

c. Even though Jane Doe (S.E.S.) and her trafficker would stay for multiple days at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

d. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services;

e. The trafficker was often present with Jane Doe (S.E.S.) at check in and would linger around the hotel or in the parking lot while she was with a john;

f. Jane Doe (S.E.S.) would give hotel management and/or employees "hush" money not to report her;

g. Hotel management and/or staff allowed Jane Doe (S.E.S.) to use certain rooms away from the office in order to rent rooms undisturbed;

h. There was heavy foot traffic in and out of Jane Doe (S.E.S.)'s room involving men who were not hotel guests;

i. Hotel management and/or staff spoke with Jane Doe (S.E.S.) or her trafficker about the heavy foot traffic in and our of Jane Doe (S.E.S.)'s room involving men who were not hotel guests;

j. Jane Doe (S.E.S.) was forced to see at least 5 johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

k. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

75. Based upon information and belief, multiple employees at the Subject Quality Inn named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

76. As such, Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (S.E.S.) was being trafficked at the Subject Quality Inn.

77. Given these obvious signs, Choice Hotels Defendants knew or should have known about the trafficking of Jane Doe (S.E.S.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

28

IV.    **Defendants actively facilitated sex trafficking at the Subject Quality Inn, resulting in the trafficking of Jane Doe (S.E.S.).**

78.    Choice Hotels Defendants and Franchisee Defendant had both actual and constructive knowledge of the trafficking of Jane Doe (S.E.S.) at the Subject Quality Inn because the trafficking was the direct result of Choice Hotels Defendants and Franchisee Defendant facilitating her trafficking at the Subject Quality Inn.

### a.    Franchisee Defendant facilitated the trafficking of Jane Doe (S.E.S.)

79.    Franchisee Defendant is responsible for the acts, omissions, and knowledge of all employees of these Subject Quality Inn when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Franchisee Defendant ratified these acts and omissions, and because Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendant, of sex trafficking occurring at these Choice hotels branded locations including the Subject Quality Inn.

80.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Quality Inn, Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

81.    Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (S.E.S.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (S.E.S.)'s sexual exploitation.

82.    Franchisee Defendant also facilitated widespread trafficking at the Subject Quality Inn, including the trafficking of Jane Doe (S.E.S.), in ways including:

a. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**b. The Choice Hotels Defendants facilitated the trafficking of Jane Doe (S.E.S.).**

83.    Upon information and belief, the Choice Hotels Defendants participated directly in aspects of the operation of the Subject Quality Inn that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (S.E.S.), as follows:

a. The Choice Hotels Defendants have publicly assumed responsibility and control over the human trafficking response of all Choice hotel properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

b. The Choice Hotels Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Choice hotel branded hotels;

c. The Choice Hotels Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and Franchisee Defendant to report suspected human trafficking to the Choice Hotels Defendants. The Choice Hotels Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

d. The Choice Hotels Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

e. The Choice Hotels Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

    f.   The Choice Hotels Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Choice Hotels Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

    g.   Although they delayed making any reasonable effort to do so, the Choice Hotels Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

    h.   The Choice Hotels Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Choice hotel properties, including suspected trafficking incidents;

    i.   The Choice Hotels Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Quality Inn;

    j.   The Choice Hotels Defendants maintained control over all details of the terms under which franchised hotels, including the Subject Quality Inn, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Choice Hotels Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject Quality Inn;

    k.   The Choice Hotels Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Subject Quality Inn, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

    l.   The Choice Hotels Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject Quality Inn, including trends that would reveal patterns consistent with human trafficking.

84.    Choice Hotels Defendants directly participated in and retained day-to-day control over renting rooms at the Subject Quality Inn by, among other things:

    a.   The Choice Hotels Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used

31

for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b.  The Choice Hotels Defendants directly made reservations for rooms at the Subject Quality Inn and accepted payment for those rooms through a central reservation system that they controlled and operated. The Choice Hotels Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

c.  The Choice Hotels Defendants established and maintained control over a brand-wide "do not rent" system. The Choice Hotels Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject Quality Inn through detailed policies that it established regarding use of this "do not rent" system;

d.  The Choice Hotels Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e.  The Choice Hotels Defendants controlled and restricted the ability of Franchisee and staff to refuse or cancel a reservation;

f.  The Choice Hotels Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g.  The Choice Hotels Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Quality Inn;

h.  The Choice Hotels Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Quality Inn until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i.  The Choice Hotels Defendants required Franchisee Defendant to use Choice Hotels Defendants' property management system, which was owned, maintained, controlled, and operated by the Choice Hotels Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

85.    The Choice Hotels Defendants had a direct business relationship with traffickers operating at the Subject Quality Inn because, among other things, the Choice Hotels Defendants directly rented rooms at the hotels, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the Choice Hotels

Defendants by developing brand loyalty and intentionally choosing Choice Hotels branded properties because it was known they created a favorable environment for trafficking.

86.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Quality Inn named herein, Choice Hotels Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (S.E.S.)

87.    Choice Hotels Defendants knew or should have known that Jane Doe (S.E.S.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing them hotel rooms and related services to facilitate Jane Doe (S.E.S.)'s sexual exploitation.

88.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Quality Inn, the Choice Hotels Defendants continued participating in a venture at these hotels, with its Franchisee Defendant and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

a.    The Choice Hotels Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining Franchisee Defendant and hotel staff regarding issues related to human trafficking;

b.    The Choice Hotels Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c.    The Choice Hotels Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Choice Hotel branded properties;

d.    The Choice Hotels Defendants implicitly approved decisions by Franchisee Defendant and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

e.    The Choice Hotels Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Subject Quality Inn;

f.   The Choice Hotels Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

g.   Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the Subject Quality Inn, the Choice Hotels Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

h.   The Choice Hotels Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i.   The Choice Hotels Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j.   The Choice Hotels Defendants provided traffickers with access to internet services in a manner that the Choice Hotels Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

89.   If Choice Hotels Defendants had exercised reasonable diligence when operating their Choice Hotels branded properties and in the areas where it retained control, Choice Hotels Defendants would have prevented the Subject Quality Inn from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (S.E.S.) Instead, Choice Hotels Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (S.E.S.)

90.   The Choice Hotels Defendants should have known about (S.E.S.)'s trafficking because it retained control over the training of the staff of the Subject Quality Inn regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If the Choice Hotels Defendants had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking,

including the trafficking of (S.E.S.) at the Subject Quality Inn. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Choice Hotels Defendants.

91.    The Choice Hotels Defendants should have known about (S.E.S.)'s trafficking because they also retained control over the response of Choice hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, the Choice Hotels Defendants facilitated sex trafficking, including the sex trafficking of (S.E.S.) in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Choice Hotels Defendants.

92.    The Choice Hotels Defendants also should have known about (S.E.S.)'s trafficking because they retained the control to adopt and enforce policies on sex trafficking for their properties, including Subject Quality Inn, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the Subject Quality Inn. The Choice Hotels Defendants allowed traffickers to access rooms for the purpose of harboring their victims, including (S.E.S.) Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Choice Hotels Defendants.

93.    The Choice Hotels Defendants also should have known about (S.E.S.)'s trafficking because they retained control over the security of the Subject Quality Inn through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting the Subject Quality Inn. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the Choice Hotels Defendants had used reasonable prudence in monitoring and

reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Choice Hotels Defendants.

94.     Jane Doe (S.E.S.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the Choice Hotels Defendants had used reasonable diligence in the aspects of hotel operations over which they retained control.

95.     Moreover, (S.E.S.)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the Subject Quality Inn over an extended period because the Choice Hotels Defendants adopted policies and practices that insulated (S.E.S.)'s trafficker from significant risk of detection or disruption.

## V.    Defendants' ventures at the Subject Quality Inn

96.     Through the conduct described above, Choice Hotels Defendants and Franchisee Defendant knowingly benefited from engaging in a venture with sex traffickers at the Subject Quality Inn named herein, including Jane Doe (S.E.S.)'s trafficker, as follows:

   a. Choice Hotels Defendants and Franchisee Defendant both received benefits, including increased revenue, every time a room was rented at the Subject Quality Inn;

   b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Subject Quality Inn, which Choice Hotels Defendants and Franchisee Defendant knew or should have known about;

   c. Choice Hotels Defendants and Franchisee Defendant associated with traffickers, including Jane Doe (S.E.S.)'s trafficker, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity;

   d. Choice Hotels Defendants and Franchisee Defendant had a mutually beneficial relationship with the traffickers at the Subject Quality Inn, fueled by sexual exploitation of victims, including Jane Doe (S.E.S.);

   e. Sex traffickers, including Jane Doe (S.E.S.)'s trafficker, frequently used the Subject Quality Inn for their trafficking because of an implicit understanding that the

Subject Quality Inn were an avenue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Choice Hotels Defendants and Franchisee Defendant facilitating that trafficking as described throughout this Complaint. This resulted in benefits, including increased revenue, for Choice Hotels Defendants and Franchisee Defendant;

f. Both Choice Hotels Defendants and Franchisee Defendant participated in this venture through the conduct described throughout Plaintiff's Original Complaint, as they were jointly responsible for relevant aspects of hotel operations; and

g. Jane Doe (S.E.S.)'s trafficking at the Subject Quality Inn was a result of Choice Hotels Defendants and Franchisee Defendant' participation in a venture with criminal traffickers. If Choice Hotels Defendants and Franchisee Defendant had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (S.E.S.)'s trafficking at the Subject Quality Inn.

97. Through the conduct described above, Choice Hotels Defendants also knowingly benefited from engaging in a commercial venture with Franchisee Defendant operating the Subject Quality Inn as follows:

a. Choice Hotels Defendants associated with Franchisee Defendant to operate the Subject Quality Inn;

b. Pursuant to the terms of the franchising agreement, both Choice Hotels Defendants and Franchisee Defendant received financial benefits from operating the Subject Quality Inn, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue;

c. By participating in a venture that facilitated sex trafficking, each Choice Hotels Defendants and Franchisee Defendant also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Subject Quality Inn specifically;

d. This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of Franchisee Defendant and the widespread sex trafficking at the Subject Quality Inn named herein;

e. Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Choice Hotels Defendants participated in the venture by continuing to associate with Franchisee Defendant to operate the Subject Quality Inn named herein in a way that it knew or should have

known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (S.E.S.); and

f.  Jane Doe (S.E.S.)'s trafficking at the Subject Quality Inn named herein was a result of Choice Hotels Defendants' and Franchisee Defendant' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Subject Quality Inn. Had Choice Hotels Defendants not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), it would not have received a benefit from Jane Doe (S.E.S.)'s trafficking at the Subject Quality Inn named herein.

## VI.  Franchisee Defendant and the Staff at the Subject Quality Inn Named Herein Acted as Actual Agents of Choice Hotels Defendants

98.    Choice Hotels Defendants is vicariously liable for the acts, omissions, and knowledge of Choice Hotels Defendants and staff at the Subject Quality Inn named herein, which are Choice Hotels Defendants' actual agents or subagents.

99.    The Choice Hotels Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Quality Inn named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Choice Hotels Defendants.

100.    The Choice Hotels Defendants obscure the full extent of control they exercise over the Franchisee Defendant by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Choice Hotels Defendants imposed on the Franchisee Defendant:

a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Quality Inn;

b.  covered virtually all aspects of hotel operations, including internal operating functions;

c.  dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Quality Inn; and

      d.  significantly exceeded what was necessary for Choice Hotels Defendants to protect its registered trademarks.

101.    In addition to the ways described above, upon information and belief, Choice Hotels Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant' day-to-day operation of the Subject Quality Inn named herein, including the following ways:

      a.  The Choice Hotels Defendants required Franchisee Defendant and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Choice Hotels Defendants to protect their registered trademarks;

      b.  The Choice Hotels Defendants provided training for hotel management and select hotel staff on-site at the Subject Quality Inn and at locations selected by the Choice Hotels Defendants;

      c.  The Choice Hotels Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

      d.  The Choice Hotels Defendants controlled training provided by Franchisee Defendant to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

      e.  The Choice Hotels Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

      f.  For certain products and services that Franchisee Defendant were required to purchase to operate the Subject Quality Inn named herein, the Choice Hotels Defendants designated approved vendors and prohibited Franchisee Defendant from purchasing goods and services from anyone other than an approved vendor;

      g.  The Choice Hotels Defendants required Franchisee Defendant to sign a technology agreement governing the terms under which Franchisee Defendant must procure and use technical services and software while operating the Subject Quality Inn named herein. Franchisee Defendant were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

      h.  The Choice Hotels Defendants set required staffing levels for the Subject Quality Inn named herein;

i.  The Choice Hotels Defendants established detailed job descriptions for all positions in its Choice hotel properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j.  The Choice Hotels Defendants set requirements for the hiring process used by Franchisee Defendant and oversaw employee discipline processes and termination decisions;

k.  The Choice Hotels Defendants provided benefits for employees of franchised hotels;

l.  The Choice Hotels Defendants required Franchisee Defendant to use a customer resource management program maintained and operated by the Choice Hotels Defendants;

m.  The Choice Hotels Defendants controlled channels for guests to report complaints or provide feedback regarding the Subject Quality Inn and directly participated in the response and/or supervised the response to customer complaints or other feedback. The Choice Hotels Defendants retained the right to provide refunds or other compensation to guests and to require Franchisee Defendant to pay associated costs;

n.  The Choice Hotels Defendants generated reports and analysis of guest complaints and online reviews for the Subject Quality Inn;

o.  The Choice Hotels Defendants required Franchisee Defendant to use a Guest Relations Application owned, operated, and maintained by the Choice Hotels Defendants to manage all guest data and information. The Choice Hotels Defendants could use the backend of this system to analyze data and generate reports;

p.  The Choice Hotels Defendants set detailed requirements for insurance that Franchisee Defendant must purchase and retain the right to purchase insurance for Franchisee Defendant and to bill Franchisee Defendant directly for that insurance if the Choice Hotels Defendants determined that the Franchisee Defendant have not purchased adequate insurance;

q.  The Choice Hotels Defendants regularly audited the books and records of Franchisee Defendant;

r.  The Choice Hotels Defendants conducted frequent and unscheduled inspections of Choice hotel properties, including the Subject Quality Inn named herein;

s.  The Choice Hotels Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if Franchisee Defendant violated any of the Choice Hotels Defendants'

detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Subject Quality Inn named herein;

t.   The Choice Hotels Defendants controlled all marketing for the Subject Quality Inn and prohibited Franchisee Defendant from maintaining any online presence unless specifically reviewed and approved by the Choice Hotels Defendants;

u.   The Choice Hotels Defendants imposed detailed recordkeeping and reporting requirements on Franchisee Defendant regarding virtually all aspects of hotel operations;

v.   The Choice Hotels Defendants supervised and controlled day-to-day operations of the Subject Quality Inn named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendant to use; and

w.   The Choice Hotels Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

## VII.   Defendants are Jointly and Severally Liable for Jane Doe (S.E.S.)'s Damages.

102.   The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (S.E.S.)

103.   Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (S.E.S.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

## I.   Count 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendant).

104.   Jane Doe (S.E.S.) incorporates all previous allegations.

105.   Jane Doe (S.E.S.) is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

106.   Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because Franchisee Defendant:

a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (S.E.S.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

107.    Violations of 18 U.S.C §1595(a) by Franchisee Defendant as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (S.E.S.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

## II.    Count 2: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).

108.    Jane Doe (S.E.S.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

109.    Through acts and omissions described throughout this Complaint, Franchisor Defendants and Franchisee Defendant received a financial benefit from participating in a venture with traffickers, including Jane Doe (S.E.S.)'s trafficker, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (S.E.S.)'s trafficker, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendants and Franchisee Defendant is liable as a beneficiary under 18 U.S.C §1595(a).

110.    Through the acts and omissions described throughout this Complaint, Franchisor Defendants received a financial benefit from participating in a venture with its respective

Franchisee Defendant regarding the operations of its respective hotel properties even though Franchisor Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

111.    Violations of 18 U.S.C §1595(a) by Franchisor Defendants and Franchisee Defendant as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (S.E.S.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

### III.    Count 3: Vicarious Liability for TVPRA Violations (Franchisor Defendants).

112.    Franchisee Defendant acted as the actual agent of its respective Franchisor Defendants when operating its respective hotel property.

113.    Through the acts and omissions described throughout this Complaint, Franchisor Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its Franchisee Defendant to operate its respective hotel property.

114.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

115.    Franchisor Defendants are vicariously liable for the TVPRA violations of its Franchisee Defendant and the subagents of that franchisee.

116.    As alleged above, Choice Hotels Defendants are directly liable to Jane Doe (S.E.S.) for violations of the TVPRA as a beneficiary under 18 U.S.C §1595(a). Franchisee Defendant is also directly liable to Jane Doe (S.E.S.) under § 2255. Choice Hotels Defendants are vicariously liable to Jane Doe (S.E.S.) for those same violations.

### **DISCOVERY RULE**

117.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (S.E.S.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

118.    Jane Doe (S.E.S.) was subject to continuous trafficking at the Subject Quality Inn through at least December 2014, which is not more than 10 years before Jane Doe (S.E.S.) filed this lawsuit.

119.    This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the Subject Quality Inn named herein and Defendants' ongoing venture with one another and with criminal traffickers.

## **RELIEF SOUGHT**

WHEREFORE, Jane Doe (S.E.S.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (S.E.S.) against all Defendants jointly and severally for:

      a.  Actual damages (until trial and in the future);

      b.  Incidental and consequential damages (until trial and in the future);

      c.  Mental anguish and emotional distress damages (until trial and in the future);

      d.  Lost earnings and lost earning capacity (until trial and in the future);

      e.  Necessary medical expenses (until trial and in the future);

      f.  Life care expenses (until trial and in the future);

      g.  Physical pain and suffering (until trial and in the future);

      h.  Physical impairment (until trial and in the future);

      i.  Exemplary/Punitive damages;

      j.  Attorneys' fees;

k.   Costs of this action; and

l.   Pre-judgment and all other interest recoverable.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues raised here.

Respectfully submitted,

**JENNER LAW, P.C.**

*/s/ Robert Jenner*
Robert K. Jenner (Fed Bar No. 04165)
Kathleen R. Kerner (Bar No. 18955)
Elisha N. Hawk (Bar No. 29169)
Joshua Wolberg (Bar No. 31283)
3600 Clipper Mill Road, Suite 240
Baltimore, Maryland 21211
Phone: (410) 413-2155
Fax: (410) 982-0122
rjenner@jennerlawfirm.com

*/s/ Annie McAdams*
**ANNIE MCADAMS PC**
Annie McAdams | SBN 24051014
(Pro hac vice pending)
2900 North Loop West
Suite 1130
Houston Maryland 77092
(713) 785-6262
(866) 713-6141 Facsimile
*annie@mcadamspc.com*

and

*/s/ David Harris*
**SICO HOELSCHER HARRIS, LLP**
David E. Harris | SBN 24049273
(Pro hac vice pending)
Luis O. Sanchez | SBN 24130926
(Pro hac vice pending)
819 N. Upper Broadway
Corpus Christi, Maryland 78401

(361) 653-3300
(361) 653-3333 Facsimile
*dharris@shhlaw.com*
*lsanchez@shhlaw.com*

**ATTORNEYS FOR PLAINTIFF**